Filed 1/21/26  P. v. Kashlakeva CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NADEJDA GEORGIEV KASHLAKEVA,<br><br>    Defendant and Appellant. | 2d Crim. No. B342308<br>(Super. Ct. No. F000426405001)<br>(San Luis Obispo County) |

Nadejda Georgiev Kashlakeva[1] appeals from the postjudgment order denying her motion to vacate her conviction. (Pen. Code, [2] § 1473.7.)  She contends prejudicial error impaired her ability to understand the immigration consequences of her no

---

[1] The record contains various spellings of appellant's name, including her last name as Kachlakeva.  She testified the correct spelling is Kashlakeva.

[2] Undesignated statutory references are to the Penal Code.

contest plea. We agree and reverse.

FACTUAL AND PROCEDURAL HISTORY

Kashlakeva is a citizen of Bulgaria. She entered the United States in 1991 or 1992 on an exchange scholar visa. She served as an instructor and teaching assistant at Oregon State University from 1992 to 1993. She worked thereafter in Portland and San Luis Obispo as a therapist and crisis worker. In 1998, she was convicted in Oregon of forgery and theft, and in 1999 was convicted again of theft. She nonetheless obtained permanent residency in 2005.

In 2006, Kashlakeva photocopied the license of a marriage and family therapist, altered it to show her name, and used the forged document to fraudulently obtain employment as a marriage and family therapist. She repeated the process in 2008 when the therapist's license was renewed. She obtained $106,610.50 in salary for treating individuals while posing as a licensed therapist. When her employer confronted her, she denied any wrongdoing.

*Criminal prosecution*

Kashlakeva was charged with felony counts of grand theft by false pretenses (§ 487, subd. (a); count 1), unlawful use of personal identifying information (§ 530.5, subd. (a); count 2), and two counts of counterfeiting the state seal (§ 472; counts 3 and 4). She was charged with enhancements for taking more than $65,000 (§ 12022.6, former subd. (a)(1)), taking more than $100,000 in crimes with a material element of fraud or embezzlement (§ 186.11, subd. (a)(1)), and theft over $100,000 (§ 1203.045, subd. (a)).

In May 2009, Kashlakeva pleaded no contest to counts 1 and 4. The parties agreed she would receive no more than one

year in jail and the remaining counts and enhancements would be dismissed.  The prosecutor stated that "the People will be seeking . . . the full one year."

At the time of Kashlakeva's nolo plea, the court advised her orally pursuant to section 1016.5, subdivision (a): "[If] you're not a citizen, you're hereby advised that conviction of the offense for which you have been charged *may have* the consequences of deportation, exclusion from admission to the United States or denial of naturalization pursuant to the laws of the United States."  (Italics added.)

The presentence probation report stated that Kashlakeva "is a permanent resident and has her green card which will be under automatic review in 2015."  She told the probation officer that "[s]he believes her residency status may be in jeopardy as a result of the present matter."  A memo from a social worker to counsel also stated that a "period of incarceration" could "precipitate immigration actions against the defendant." Kashlakeva's counsel filed a statement in mitigation requesting 30 days in jail and community service.  Attached were numerous letters from attorneys and from individuals she treated, praising her professional skills and service to the community.  Some letters described personal ties to Kashlakeva.

The prosecutor requested "the full one year in the county jail."  The court placed Kashlakeva on five years' formal probation with terms including one year in the county jail and restitution of $106,610.50.  She received presentence credit for time served of seven actual days plus conduct credit of two days. We affirmed the judgment.  (*People v. Kachlakeva* (Apr. 28, 2010, B218304) [nonpub. opn.] 2010 WL 1692241.)

3

*Deportation*

In 2010, Kashlakeva received a notice to appear in immigration court.  The notice alleged she was subject to removal based on the sentence of at least one year for the grand theft conviction, which made the case an aggravated felony.  (8 U.S.C. § 1101(a)(43)(G).)  She conceded her removability and requested she be immediately removed.  She was deported to Bulgaria, where her parents, sister, and sister's husband lived.

*Motion to vacate*

In June 2023, the public defender filed a motion to vacate Kashlakeva's plea pursuant to section 1473.7.  Attached to the motion were numerous exhibits, including documents that were attached to the 2009 mitigation statement.  The exhibits included verification of her education in Bulgaria and her employment at Oregon State University.  Letters from four attorneys attested to her counseling skills and the extraordinary assistance she had provided their clients.  One attorney described her as a "friend to [him] and many of the court staff, attorneys and judges for many years."  Three of her clients, including a psychology professional and a retired judge, expressed their gratitude for helping them with mental health issues.  Several noted that she went above and beyond her duties to personally assist them, and one described her as a "resource in our community."  Although she was separated from her second husband, who is American, he stated they still loved each other.  His mother also wrote a letter of support.

A letter from Kashlakeva's boyfriend described how they met professionally in 2005 at an inpatient unit where he was a nurse and she provided crisis services.  He noted her "very good relationship with all the staff."  He praised her skills and

4

compassion, described how their professional relationship developed into a personal relationship, and said they "live happily together."

Also attached to the motion was Kashlakeva's declaration. It said her attorney never discussed immigration consequences with her. It also said, "Not being separated from my teenage son was of paramount importance to me." Had she known a 365-day sentence would result in mandatory deportation, she would not have pleaded guilty[3] and would have "taken [her] chances at trial." When she was arrested by immigration authorities, she contacted her attorney from the detention center in El Paso and asked about reducing the sentence to 364 days. He said it was too late. She had then lived in Bulgaria since 2010, where she "was not able to follow the changes in the law in 2017 which allow[ed] [her] to challenge [her] conviction for the lack of immigration advisement."

Kashlakeva was appointed counsel for the hearing on her section 1473.7 motion. The court considered the 2009 probation report, which noted her concern that the case could impact her residency status. The attorney who represented her when she pleaded no contest was deceased, but nothing in his file referenced immigration consequences.

*Kashlakeva's testimony*

Kashlakeva testified at the evidentiary hearing. She said her son was six months old when they came to the United States in February 1992. The only immigration consequence of her Oregon convictions was she had to write a letter describing the hardship denial of residency would present. She was then

---

[3] She actually pleaded no contest.

granted a green card.

Kashlakeva testified the son's father was "abusive" and they divorced in 2005. When the son turned 15, he refused to go to his father's residence. Kashlakeva was concerned about her son's "emotional well-being" because the possibility he might have to live with his father caused him stress that made his diabetes worse. When she pleaded no contest, her concern about her son was the "main thing in [her] life." Kashlakeva was the son's "primary parent," and she obtained full custody.

Kashlakeva's son became a permanent U.S. resident in 2000 and a naturalized citizen in 2020. He was a dual U.S. and Bulgarian citizen. He lived in the United States but visited her in Bulgaria four times after she was deported because of her plea in this case.

The attorney who represented Kashlakeva when she pleaded no contest never discussed immigration consequences or strategies with her. Only after her immigration arrest did she learn it might make a difference if the sentence was 364 rather than 365 days. During the three months she was detained by immigration authorities, she contacted the attorney who had represented her when she pleaded nolo. He said it was too late to change the sentence.

Kashlakeva testified she was employed in San Luis Obispo County handling court-referred drug treatment cases and "knew most of the attorneys and judges." She spoke to attorneys between 2010 and 2013, but they were unable to help her. She maintained contact "off and on" with attorney Matthew Guerrero. In 2023, she asked him to recommend an immigration lawyer so she could visit her family. He suggested she contact the public defender's office. She did so, and they filed the motion to vacate.

6

*Ruling*

The trial court denied the motion.  The court found that Kashlakeva's claim in her declaration that she could not follow changes in California law from Bulgaria was "not very credible." The court noted she was highly educated and was employed in Bulgaria by a United Nations agency that provided services to immigrants going through the immigration process.  The court did not make an adverse credibility finding regarding any other statement in Kashlakeva's declaration or testimony.  The court stated, "[E]ven if the Court were to find that the motion . . . was not filed with reasonable diligence, which I think it was not," it would exercise its discretion to hear the motion on the merits.

The court concluded that Kashlakeva's attorney failed to advise her regarding the immigration consequences of her plea. But the court concluded she failed to show prejudicial error because she did not demonstrate "deep, longstanding ties" to the United States.  Her son was about 18 at the time of the plea, was a Bulgarian citizen, and traveled between the United States and Bulgaria.  The court stated it "didn't have the benefit of any declarations from family members here, like her son, friends, colleagues, community members, or other acquaintances."  The court also stated that her deception "kind of dissolved" her ties to the community.  It found Kashlakeva failed to show immigration-neutral alternatives would have been available or that the prosecution would have considered them.

DISCUSSION

*Standard of review*

"[S]ection 1473.7 allows noncitizens who have served their sentences to vacate a conviction if they can establish by a preponderance of the evidence that their conviction is 'legally

7

invalid due to prejudicial error damaging [their] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence.' " (*People v. Espinoza* (2023) 14 Cal.5th 311, 316 (*Espinoza*).) If the required showings are made, the court must vacate the conviction or sentence. (§ 1473.7, subds. (a)(1), (e)(1).) It is our duty to construe this legislative exception to the principle of finality of judgments. Relief is not predicated on the gravity of a conviction.

Appeals from section 1473.7 hearings are subject to independent review. (*Espinoza*, *supra*, 14 Cal.5th at p. 319.) Under this standard, " ' "an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." ' " (*Id*. at pp. 319–320.) We "give deference to the trial court's factual determinations if they are based on ' " 'the credibility of witnesses the [superior court] heard and observed.' " ' [Citation.] But when the trial court's findings 'derive entirely from written declarations and other documents,' the trial court and the reviewing court ' "are in the same position," ' and no deference is owed." (*Id*. at p. 320.)

The dissent overstates the significance of the trial court's comment regarding Kashlakeva's credibility. The trial court questioned only the assertion in her declaration that she could not follow changes in California law from Bulgaria. This statement was relevant only to the issue of diligence. We find nothing incredible about the premise that had Kashlakeva known a sentence of 365 days would cause her to be deported, she would have sought a sentence of one day less.

*Diligence*

Subject to statutory exceptions, a motion to vacate based on immigration consequences "shall be deemed timely filed at any time in which the individual filing the motion is no longer in criminal custody." (§ 1473.7, subd. (b)(1).) The exceptions state the motion "may be deemed untimely filed if it was not filed with reasonable diligence after the later of" several events: receipt of a notice to appear in immigration court, notice from immigration authorities asserting adverse consequences from the conviction or sentence, or notice of a final removal order. (§ 1473.7, subd. (b)(2).)

The statutory exceptions to timeliness do not apply here. Because Kashlakeva was given notice of immigration consequences *before* the 2017 effective date of section 1473.7, the test is: "What event in [Kashlakeva's] life that occurred *after* section 1473.7 became effective would have given [her] 'a reason to look for the existence of [new] legal grounds for relief' or, at a minimum, 'put [her] on notice of the need to investigate?' " (*People v. Alatorre* (2021) 70 Cal.App.5th 747, 762 (*Alatorre*).) We "assess[] the reasonableness of the petitioner's diligence from that point forward." (*Id*. at p. 765.) In so doing, we "must take into account the totality of the circumstances." (*Id*. at p. 766.)

Here, as in *Alatorre*, Kashlakeva "periodically sought legal counsel" after she was deported. (*Alatorre, supra*, 70 Cal.App.5th at p. 754.) Even if the trial court did not believe she was unable to access California legislation from Bulgaria, the record does not suggest some event occurred between the time the legislation became effective in 2017 and her contact with Guerrero in 2023 that put her on notice. As in *Alatorre*, Kashlakeva's motion was filed a few months after she was referred to an attorney who

9

could advise her about postconviction relief. (*Id.* at pp. 754, 766–767.) We conclude the motion was timely.

*Prejudicial error*

Relief pursuant to section 1473.7 requires that the defendant show "prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (a)(1).) Because Kashlakeva's conviction of theft with a one-year sentence constituted an aggravated felony, she was "subject to mandatory deportation and permanent exclusion from the United States" and was also " 'ineligible for cancellation of removal, a form of discretionary relief allowing some deportable aliens to remain in the country.' " (*People v. Carrillo* (2024) 101 Cal.App.5th 1, 15 (*Carrillo*); 8 U.S.C. §§ 1101(a)(43)(G), 1227(a)(2)(A)(iii), 1229b(a)(3), (b)(1)(C).)

Kashlakeva's ignorance of the immigration consequences of her conviction and sentence was an error that damaged her ability to "meaningfully understand" and "knowingly accept" those consequences. (§ 1473.7, subd. (a)(1); *People v. Mejia* (2019) 36 Cal.App.5th 859, 871.) A showing of ineffective assistance of counsel was not required[4] because the motion was based on the inadequate advisement by the trial court that the conviction "may have" immigration consequences and "the '*defendant's own error* in . . . not knowing that [her] plea would subject [her] to

_____

[4] The plea here predated *Padilla v. Kentucky* (2010) 559 U.S. 356, 371, and the 2015 enactment of sections 1016.2 and 1016.3, which require defense counsel to advise criminal defendants of the immigration consequences. (See *Carrillo, supra,* 101 Cal.App.5th at pp. 17–18.)

10

mandatory deportation and permanent exclusion from the United States."  (*Mejia*, at p. 871.)

Here, Kashlakeva's conviction with a 365-day jail sentence caused her removal.  (§ 1473.7, subd. (e)(1).)  Kashlakeva had reason to believe the conviction and one-year jail sentence would not cause her deportation.  Her criminal cases in Oregon did not result in deportation; on the contrary, after writing a letter about the hardship that removal would cause, she was issued a green card.  Although her Oregon convictions and/or the current conviction without a one-year jail term might have constituted moral turpitude crimes with potential immigration consequences—a question we do not resolve here—the immigration notice she received was not based on that theory.  And such convictions might not have automatically excluded her from the United States or precluded her from cancellation of removal.  (8 U.S.C. §§ 1182(a)(2)(A), 1229b(a); *People v. Kim* (2009) 45 Cal.4th 1078, 1087–1088.)

Kashlakeva's assertion that her attorney did not advise her of adverse immigration consequences is corroborated by the absence of that subject in his file.  There was no indication her attorney considered the immigration consequences of her plea even though a social worker had expressed concern and Kashlakeva had expressed concern to probation.  This failure impeded Kashlakeva's ability to understand the consequences of her plea. (*People v. Padron* (2025) 109 Cal.App.5th 950, 960–961 (*Padron*).)  The trial court's advisement pursuant to section 1016.5, subdivision (a) that the conviction "may have" immigration consequences was inadequate because deportation was mandatory and counsel "never advised" her "that pleading no contest to the charges at issue would result in [her] deportation."

11

(*Espinoza, supra*, 14 Cal.5th at p. 320; *Padron*, at p. 962.)  The fact that at the time of the section 1473.7 hearing she was employed by an agency that provides services to immigrants going through the immigration process does not establish that she knew the immigration consequences when she entered her plea 14 years earlier.

A defendant seeking section 1473.7 relief must demonstrate that the error is "prejudicial," meaning a " 'reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences.' " (*Espinoza, supra*, 14 Cal.5th at p. 316.)  This " 'might be based either on the desire to go to trial or on the hope or expectation of negotiating a different bargain without immigration consequences.' " (*People v. Vivar* (2021) 11 Cal.5th 510, 529.)  "[R]elief is available if the defendant establishes he or she would have rejected the existing bargain to accept or attempt to negotiate another." (*People v. Martinez* (2013) 57 Cal.4th 555, 559.)

" 'Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible.' " (*Espinoza, supra*, 14 Cal.5th at p. 320.)  "Also relevant are the defendant's probability of obtaining a more favorable outcome if [they] had rejected the plea, as well as the difference between the bargained-for term and the likely term if [they] were convicted at trial." (*Ibid*.)  "These factors are not exhaustive, and no single type of evidence is a prerequisite to relief." (*Id*. at p. 321.)

12

The defendant must produce " ' " 'objective evidence' " ' to corroborate factual assertions" such as "contemporaneous documentation." (*Espinoza*, *supra*, 14 Cal.5th at p. 321.) "Objective evidence of a defendant's community ties includes facts provided by a defendant's declaration or declarations from family members, friends, colleagues, community members, or other acquaintances." (*Ibid*.)  The trial court's assertion that there were no declarations from family members, friends, colleagues, or community members is contrary to the numerous such letters submitted on Kashlakeva's behalf in her mitigation statement.  And the letters were written after Kashlakeva's conviction, contrary to the trial court's conclusion that her ties were "dissolved" by her deception.  Nor did her fraud diminish her relationship with her only child who lived in the United States.

Based on our independent review, we conclude Kashlakeva has shown prejudicial error based on the totality of the circumstances.  At the time of her plea, Kashlakeva had resided and worked in the United States for 18 years before the 365-day jail sentence.  She had custody of her son, who resided in the United States since he was six months old.  He was her only child and retaining custody was important to Kashlakeva because it reduced the stress that would have aggravated her son's medical condition.  Numerous letters attached to her statement in mitigation, filed shortly after her no contest plea, corroborated her social and professional community ties in the United States.

Kashlakeva demonstrated the importance of remaining in the United States when she took the steps necessary to obtain permanent resident status after her earlier convictions.  She told the probation department about her concern regarding the effect

13

her current conviction would have on her residency.  Had she known she could have avoided automatic deportation by reducing her jail term by a single day, it is reasonably probable she would have sought to do so.

" 'A reasonable probability does not mean more likely than not.  [Citation.]  Instead, it means merely a reasonable chance, which is more than an abstract possibility.' " (*Padron, supra*, 109 Cal.App.5th at p. 959.)  The court "need not decide whether the prosecution would actually 'have offered a different bargain'— rather, the court should consider 'evidence that would have caused *the defendant* to expect or hope a different bargain would or could have been negotiated.' " (*People v. Vivar*, *supra*, 11 Cal.5th at p. 529.)

The dissent asserts that Kashlakeva would not have gone to trial because of the higher potential sentence if convicted and the lack of a viable defense.  But based on the record before us, we cannot conclude the trial court would have handed down a lengthy prison sentence.  The prosecutor and Kashlakeva's counsel plea bargained a probationary resolution.  And the probation department recommended probation as the appropriate disposition.

Relief under section 1473.7 may be granted even if the defendant could not reasonably expect a disposition " 'with no immigration consequences,' " if they "may have reasonably hoped to secure a plea to a charge with lesser immigration consequences." (*Padron, supra*, 109 Cal.App.5th at p. 965.)  Although the prosecutor requested "the full one year" in jail, Kashlakeva reasonably could have hoped to negotiate a jail term of one day less.  This might be accomplished, for example, by waiving credits for her presentence incarceration.  (*Carrillo*,

14

*supra*, 101 Cal.App.5th at p. 6; *People v. Tate* (2016) 248 Cal.App.4th 332, 337.) Since this could have resulted in her spending *additional* actual days in custody, there is a reasonable possibility the district attorney—or the court without agreement of the district attorney—would have agreed since her negotiated disposition included a one-year lid for custody time. Thus, Kashlakeva could have reasonably believed that a more favorable immigration disposition was possible. (*Espinoza, supra*, 14 Cal.5th at p. 320.)

We are cognizant that Kashlakeva's ties to the United States may not have been as compelling as cases such as *Espinoza, supra*, 14 Cal.5th at pages 322–324 (defendant came to United States at age 13, his wife and five children were United States citizens, and he was a caregiver for his parents in the United States) or *People v. Lopez* (2022) 83 Cal.App.5th 698, 707, 715 (defendant moved to United States at age 13, his entire family were United States citizens, and he lacked meaningful ties to his country of origin). But the strength of ties to the United States is not an independent requirement for section 1473.7 relief. It is but one factor in determining whether the defendant would have sought a disposition with more favorable immigration consequences if she had been aware of the law. (*Espinoza, supra*, 14 Cal.5th at pp. 320–322.)

Moreover, just because Kashlakeva had family in Bulgaria does not mean she had insufficient ties to the United States. She had lived in the United States for almost two decades. Her only child lived in the United States. It is not uncommon for immigrants to have family in their homelands but to nevertheless have deep ties to the United States.

We do not condone Kashlakeva's conduct. But "the only

finding that the court is required to make is whether the conviction is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (e)(4).) Based on the totality of the circumstances and our de novo review, we conclude Kashlakeva has shown a reasonable probability that if she had understood the consequences of her plea, she would have sought a more favorable disposition by requesting a jail sentence of one day less or waiving custody credits. (*Espinoza, supra*, 14 Cal.5th at p. 325.) Kashlakeva has established prejudicial error.[5]

### DISPOSITION

The order denying Kashlakeva's section 1473.7 motion is reversed.

<u>NOT TO BE PUBLISHED.</u>

BALTODANO, J.

I concur:

CODY, J.

---

[5] Granting relief here does not necessarily determine the question of whether Kashlakeva will be permitted to return to the United States because she had two prior theft convictions and immigration determinations are made by federal officials. (See 8 U.S.C. §§ 1227(a)(2)(A)(ii) [deportable if two moral turpitude offenses], 1229b [cancellation of removal]; *People v. Kim, supra*, 45 Cal.4th at pp. 1086–1087, fns. 3 & 4 [Immigration and Naturalization Service discretion].)

16

YEGAN, J., dissenting:

I respectfully dissent. Before demonstrating that there is no reversible error here, I offer the following observations: This is a sad day for the traditional and time-honored concept of "finality of judgment." It is also a sad day because the solemnity of a change of plea proceeding is now reduced to a game. The concept of guilt or innocence is now set aside. Federal immigration concerns intrude upon, and here, defeat the orderly criminal process in California. You do not need to be a judge or a lawyer to see that something is wrong here. Collateral, but real-life, consequences should not trump this conviction agreed to by appellant 10 years ago.

Appellant accepted the People's lenient offer of probation with a year in county jail. Now, more than a decade later, she seeks to reject it. With her background and experience in immigration matters, appellant actually knew, or reasonably should have known, that she was going to be deported when she entered her no-contest plea. And that is what happened ten years ago.

The majority opinion reads like an amicus brief for the appellant. The majority substitutes its rulings for that of the trial court. This violates the fundamental rule on appeal. The trial court's rulings are presumed to be correct. Error is never presumed and it is appellant's burden to show not only error, but reversible error. We are supposed to view the evidence in the light most favorable to the order under review and draw all inferences to support the trial court's order. The majority opinion does not do so. These rules are not suspended in "immigration cases" where, as here, the appellant testifies at the evidentiary hearing. (*People v. Espinoza* (2023) 14 Cal.5th 311, 320 (*Espinoza*).)

The trial court, sitting as trier of fact, obviously did not

credit appellant's factual assertions, or it would have granted relief. The majority opinion analyzes the issues on appeal giving credit to appellant's factual presentation. There is a good reason why the trial court did not believe appellant and why her testimony is more than suspect. Her testimony should not be credited. Even on paper, appellant appears to be dishonest. She is a recidivist thief, and a forger. She was convicted of two prior thefts, one in 1998 and one in 1999. Her crimes show a criminal sophistication beyond those of an ordinary thief. Here, she has victimized not only her employer, but the hundreds of clients who sought help from a person thought to be licensed to provide mental health guidance. She went so far in her deception that she had a sign at her office stating that she was a Ph.D. and a clinical psychologist. In addition, she has, in a sophisticated way, defrauded the state of California and defiled the great seal by forging the state license. This is an incredibly serious offense for which a reasonable trial court judge could easily impose a state prison sentence.

"*Falsus in uno, falsus in omnibus.*" (Black's Law Dict. (8th ed.) p. 637, col. 1.) Standard California jury instructions caution that "[a] witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others." (CALJIC 2.21.2.) The trial court directly ruled that appellant was not to believed on her claim of timeliness. But the majority credits all of her factual claims. This is improper. Her false testimony on timeliness logically carries over to other factual assertions. The claim that she would have taken her chances at trial if she had known that she was to be deported, is beyond dubious. I simply ask, even on independent review, why should we believe

appellant?[1]

Appellant should be careful about what she wishes for. This case, unlike others, is still provable. She either was licensed or she was not. She either forged the license or she did not. The custodian of records can now easily testify that appellant is not a licensed mental health professional. In other stale cases, law enforcement officers may have retired or otherwise be unavailable. And, evidence, e.g., drugs, may have been destroyed. Here, successful vacation of the guilty plea allows the People to proceed on the merits. It is reasonable to assume that the case is still "provable." This will subject appellant to a warrant for her arrest and a state prison term if she presents herself in the County of San Luis Obispo. This also is unlikely as appellant cannot present herself to federal immigration officials as a person worthy of re-entry to the United States of America. This is true even if the majority opinion carries the day and the plea is vacated.

I need not go through, item by item, just how the majority has gone astray. As I explain below, we should affirm the order denying appellant's Penal Code section 1473.7 motion because she failed to make the requisite showing of prejudice.[2]

"To prevail under section 1473.7, a defendant must demonstrate that his conviction is 'legally invalid due to prejudicial error damaging [his or her] ability to meaningfully understand . . . the actual or potential adverse immigration

---

[1] Appellant may have deceived her theft victim in 1998. She deceived her theft victim in 1999. She deceived her employer in San Luis Obispo. She deceived her patients. She deceived the State of California. Now, she has deceived the majority of this court.

[2] All statutory references are to the Penal Code.

3

consequences of a conviction or sentence.' (§ 1473.7, subd. (a)(1).) The defendant must first show that he did not meaningfully understand the immigration consequences of his plea. Next, the defendant must show that his misunderstanding constituted prejudicial error. '[P]rejudical error . . . means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences.'" (*Espinoza, supra,* 14 Cal.5th at p. 319.) We independently review the trial court's decision. (*Id*. at pp. 319-320.)

"To determine whether there is a reasonable probability a defendant would have rejected a plea offer if he had understood its immigration consequences, courts must 'consider the totality of the circumstances.' [Citation.] 'Factors particularly relevant to this inquiry include the defendant's ties to the United States . . . and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible.'" (*Espinoza*, *supra*, 14 Cal.5th at p. 320.)

"Ties to the United States are an important factor in evaluating prejudicial error under section 1473.7 because they shed light on a defendant's immigration priorities. [Citation.] . . . Community ties may be established by length of residence; immigration status; lack of connection to the country of origin; connections to family, friends, or the community; work history or financial ties; or other forms of attachment." (*Espinoza*, *supra*, 14 Cal.5th at p. 321.) "[A] defendant's deep and long-standing ties to the United States . . . can support an inference that immigration consequences were of paramount concern at the time of the defendant's guilty plea." (*Id*. at p. 323.)

The trial court conducted an evidentiary hearing at which appellant testified via Zoom. Her testimony included the following facts: she was born in Bulgaria and went to university

4

there. In 1992 she came to the United States with her six-month-old son.[3] Her parents, sister, and her sister's husband remained in Bulgaria. Her son is her only relative living in the United States. In 2006 he turned 15 years old. He lived solely with her from 2006 through 2009, when she entered her no contest plea in the present case. At the time of the plea, he was not a United States citizen. He became a citizen in 2020.

"In a declaration submitted with [her] section 1473.7 motion, [appellant] claims [she] would never have entered this plea had [she] understood that it would require [her] deportation. But when a defendant seeks to withdraw a plea based on inadequate advisement of immigration consequences, [our Supreme Court has] long required the defendant corroborate such assertions with "'objective evidence.'"" (*People v. Vivar* (2021) 11 Cal.5th 510, 530 (*Vivar*).)

The trial court determined that appellant had not presented objective evidence demonstrating a reasonable probability that she would have rejected the plea offer had she understood its immigration consequences. The court found that appellant had failed to establish strong ties to the United States: "[W]e know in this case that the defendant lived in the United States from 1992 to her deportation in 2010. But . . . [appellant] did not present any objective evidence of deep, longstanding ties -- and strong ties -- to the United States." "I understand that the defendant said that she successfully cultivated an integral relationship with the community, but it seems that that relationship was based on her . . . professional role. And, of

---

[3] According to the probation report, appellant was born in June 1965. Thus, she was approximately 27 years old when she came to the United States.

course, once the deception regarding the licensing occurred, . . . those ties kind of dissolved."

In other words, appellant's alleged ties to the community were based on counseling she had unlawfully provided to patients under the fraudulent representation that she was a licensed marriage and family therapist. The record includes supportive letters attached to her 2009 statement in mitigation, but they were from persons whom appellant had deceived into believing that she was duly licensed. One former patient wrote, "I now know that [appellant] had, for a long time, misrepresented her licensing status."

According to the probation report, appellant also fraudulently represented to the community that she had a PhD degree and was a clinical psychologist. The probation report stated: "[An informant] advised he had seen a sign on a rented office space in San Luis Obispo with [appellant's] name on it referring to her as 'clinical psychologist.' Investigators responded to the office . . . and observed a sign displaying the words 'Nadia Kashlakeva, PhD, Clinical Psychologist.' [¶] On 07/23/08, investigators received a Board of Psychology certification signed by the Board's Assistant Executive Officer, stating Nadia Kashlakeva was not, nor had she ever been licensed as a [] psychologist or as a psychologist assistant." Appellant told the probation officer that "her level of education is equivalent to a Master's Degree [not a PhD] at an accredited institution."

Thus, instead of cultivating her ties to the community, appellant perpetrated a scam upon the community. A showing of strong ties to the community should not be predicated upon a scam, even though some of the scammed patients and appellant's co-workers wrote letters attesting to her counseling skills and dedication to her work.

The probation officer spoke to Sanford Friedlander, who

had hired appellant "to work as a therapist, [and] subsequently a crisis worker, for the County of San Luis Obispo."  Friedlander "described this as a 'sad case' and maintained the defendant has caused irreparable damage to numerous clients, therapists and administrators.  He believes his reputation has been damaged after many years of hard work and dedication solidifying relationships within the local therapeutic community.  He stated, 'I feel raped. . . .  [T]here appears to be no remorse on her part.'  Mr. Friedlander believes he will be paying the price for her behavior and conduct as she was representing herself as a trained and licensed therapist.  He further stated, 'She took away individual rights and who really knows how many lives she has affected.'"

As to appellant's ties to the United States, the trial court also observed: "[H]er son turned 18 years old sometime around the disposition of this case.  He was living at the time with his father.  And actually, at the time of sentencing, . . . he was visiting family in Bulgaria."  Thus, it was not necessary for appellant to remain in the United States to supervise or protect a minor child.  Moreover, she would be able to see her son in Bulgaria.  The majority opinion acknowledges that her "son was about 18 at the time of the plea, was a Bulgarian citizen, and traveled between the United States and Bulgaria."  (Maj. opn., p. 7.)

"Community ties may be established by . . . lack of connection to the country of origin . . . ."  (*Espinoza, supra*, 14 Cal.5th at p. 321.)  Appellant was well-connected to her family in Bulgaria.  The trial court said: "It should . . . be noted that in the paperwork that was filed it's mentioned that after immigrating, [appellant] continued to share a very close relationship with her extended family in Bulgaria, and her son actually visited twice following her deportation in 2011, 2012. . . . [W]e don't have any

7

declaration or . . . really any information that was given, even during the testimony of [appellant], about any other type of relationship here in the United States."

Appellant's weak ties to the United States contrast with the defendant's strong ties in *Vivar, supra,* 11 Cal.5th 510: "In *Vivar*, we [our Supreme Court] held that a defendant's substantial ties to the United States were an important factor in support of granting relief. Vivar 'was brought to this country at age six . . . , and he attended schools, formed a family, and remained here for 40 years.' [Citation.] 'At the time of his plea, he had two children, two grandchildren, and a wife, all of whom are citizens and all of whom resided in California. . . . Vivar had virtually no ties to Mexico . . . .' [Citation.] We concluded that these facts provided objective evidence of 'Vivar's concern about the immigration consequences of his plea options,' supporting a finding of prejudicial error." (*Espinoza, supra,* 14 Cal.5th at p. 322.)

Appellant's weak ties also contrast with the defendant's strong ties in *Espinoza, supra,* 14 Cal.5th at p. 322: "Espinoza has spent most of his life in the United States. He came to California when he was 13 years old. At the time of the plea, Espinoza had lived in California for 23 years. His wife and five children were United States citizens. His parents and siblings lived in the United States. He was the financial provider for his family. As Espinoza puts it, '[e]verything important in his life' at the time he entered his plea 'was in the United States.' [Citation.] Espinoza's deep and long-standing ties are undisputed and weigh in favor of finding that he would have considered immigration consequences to be of paramount concern in deciding whether to accept a plea agreement."

In determining whether appellant demonstrated a reasonable probability that she would have rejected the plea offer

8

had she understood its immigration consequences, the trial court considered "'whether [she] had reason to believe an immigration-neutral negotiated disposition was possible.'" (*Espinoza, supra*, 14 Cal.5th at p. 320.) The trial court properly concluded that appellant did not have reason to so believe: "What we know is that [appellant] has two prior convictions for theft and fraud-related offenses . . . , arguably[] crimes of moral turpitude. We know that in this particular . . . case, based on [her] prior background[,] . . . there was no indication presented that the prosecution . . . would consider something else, some other charges." The majority opinion notes that "the prosecutor requested 'the full one year' in jail." (Maj. opn., p. 14.) Appellant presented no evidence of "the district attorney's charging policies with respect to immigration consequences . . . ." (*Espinoza, supra*, at p. 323; see also *People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 665 [defendant "did not offer an expert declaration opining that alternative, nondeportable dispositions would have been available and acceptable to the prosecutor"].)

Because of her prior criminal record, appellant's situation was different from the defendant's situation in *Espinoza*: "Espinoza had no prior criminal history at the time of his plea. This fact is relevant because a defendant without an extensive criminal record may persuasively contend that the prosecutor might have been willing to offer an alternative plea without immigration consequences." (*Espinoza, supra*, 14 Cal.5th at p. 324.)

In any event, "the key question under section 1473.7 is "'what the defendant would have done."'" (*Espinosa, supra*, 14 Cal.5th at p. 324.) "That the defendant would have [rejected the plea bargain] is not established by evidence that . . . an immigration-neutral bargain was possible." (*People v. Martinez* (2013) 57 Cal.4th 555, 568 (*Martinez*).)

9

Appellant did not show she had a viable defense to the charges.  "A defendant without any viable defense will be highly likely to lose at trial.  And a defendant facing such long odds will rarely be able to show prejudice from accepting a guilty plea that offers him a better resolution than would be likely after trial."  (*Lee v. U.S.* (2017) 582 U.S. 357, 367.)  "[A] factor pertinent to the decision to accept or reject a plea may be the "'disparity between the terms of the proposed plea bargain and the probable consequences of proceeding to trial, as viewed at the time of the offer . . . .'"'"  (*Martinez, supra*, 57 Cal.4th at p. 564.)  At the time of the 2009 offer, appellant faced a lengthy potential sentence of 16 months, 2, or 3 years on count 1 (grand theft – § 487, subd. (a)); a consecutive sentence of eight months on count 2 (unlawful use of personal identifying information – § 530.5, subd. (a)); consecutive sentences of eight months on each of counts 3 and 4 (forgery of the state seal, § 472); plus a one-year consecutive term for the aggravated white collar crime enhancement.  (§ 186.11 subds. (a)(1), (a)(3); former § 12022.6, subd. (a)(1).)

Accordingly, I agree with the trial court that, because appellant failed to establish prejudicial error, she did not carry her burden of showing she qualifies for section 1473.7 relief.

NOT TO BE PUBLISHED.

YEGAN, Acting P. J.

10

Catherine J. Swysen, Judge

Superior Court County of San Luis Obispo

_____

Sabrina R. Damast for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews, Eric J. Kohm and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.